# United States District Court
# for the Southern District of Georgia
# Brunswick Division

FILED
Scott L. Poff, Clerk
United States District Court
By casbell at 4:03 pm, Mar 27, 2019

BELETA LOCKWOOD,

    Plaintiff,

v.                                  2:16-cv-123

COASTAL HEALTH DISTRICT 9-1,

    Defendant.

## ORDER

This case arose following the August 11, 2015 termination of Ms. Beleta Lockwood ("Plaintiff"), an African-American female, from her job as Early Intervention Coordinator for the Babies Can't Wait program at the Coastal Health District 9-1 ("Coastal Health District" or "Defendant"). She sued Defendant for race discrimination under Title VII of the Civil Rights Act of 1965, 42 U.S.C. § 2000e, *et seq.* ("Title VII").[1]

Pursuant to an agreement by both parties, a bench trial was held on August 21 and 22, 2018. Dtk. Nos. 63, 64. After hearing the testimony of eleven witnesses and considering all of the evidence tendered, the Court makes the following findings of

---

[1] Plaintiff's claims against those who did not employ her were previously dismissed, as she conceded they were not her employers. Dkt. No. 35. Likewise, her claims for retaliation under Title VII were previously dismissed, as she conceded that she had not engaged in statutorily protected activity prior to her termination. *Id.*; Dkt. No. 23-4 at 86. Her age discrimination claim, 29 U.S.C. § 623 *et seq.*, was dismissed on immunity grounds. Dkt. No. 35.

fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

I. **Findings of Fact**

The Court makes the following findings of fact:

(1)

Plaintiff is an African-American woman who was employed as an Early Intervention Coordinator for the Babies Can't Wait program at the Coastal Health District from 2010 until 2015. Dkt. No. 86 at 66.

(2)

She was terminated on August 11, 2015 by Dr. Diane Weems, the Director of the Coastal Health District. Id. at 139. Weems told Plaintiff that she was no longer a good fit. Id. at 117.

(3)

Plaintiff was supervised first by Matthew Walker, then by Dr. Saroyi Morris, an African-American woman, and, finally, by Elizabeth Dixon, a Caucasian woman. Id. at 74.

A. **Plaintiff's Testimony**[2]

(4)

Plaintiff believes she had no problems or issues working with Morris and admired Morris. Id. at 82-83, 95. Plaintiff's complaints are reserved for Dixon, whom she describes as treating her in an overbearing manner. Id. at 84-120.

---

[2] Plaintiff filed her case as a *pro se* litigant. However, the Court appointed attorney Adrienne Browning to assist Plaintiff in presenting her testimony and evidence.

AO 72A
(Rev. 8/82)

(5)

Plaintiff describes multiple incidents she characterizes as poor treatment by Dixon including Dixon placing a box of red dishes on Plaintiff's desk, Dixon making a statement at the office retreat that someone was watching their building, Dixon asking Plaintiff to move boxes from a closet, Dixon asking Plaintiff to remove window blinds, Dixon telling Plaintiff to stop a presentation Plaintiff was giving, Dixon not asking Plaintiff to be in charge while Dixon was out of town, Plaintiff's request for additional staff being denied, and a reimbursement for the taxes on a rental car being reduced. Plaintiff generally took issue with Dixon's demeanor. Additionally, Plaintiff believes Dixon did not value or understand the Babies Can't Wait program adequately. Id. at 85-122.

(6)

Although Plaintiff cannot recall any other African Americans being treated in such a manner, id. at 93, Plaintiff testified that on one occasion Dixon remarked that African Americans do not age as quickly as other races, id. at 93-94. Additionally, Plaintiff testified that on another occasion, Dixon asked about Plaintiff's sorority and whether Dixon could be a member. Id. at 94. The sorority is an African-American sorority. Id. at 131. Other than those two statements, no one

associated with Defendant made any race-oriented statements. Id. at 131.

(7)

Plaintiff testified that she received raises and bonuses and that she had never been formally or informally reprimanded or had attendance issues. Id. at 74-78.

(8)

When asked what she believes the reason for her termination was, Plaintiff explained:

> I really believe that Betty Dixon did not like me, and I say that due to the fact that I really believe she was very jealous of me, my intellect, my skills, my talents, how I dressed, how I spoke, how I communicated, and I think as a black person, I'm not supposed to be like that from her eyes, I'm assuming. So I think those are the reasons.

Id. at 121-22.

(9)

When asked "[d]o you believe that you were terminated essentially because of your race?" Plaintiff responded, "I can believe that, yes." Id. at 122.

(10)

Plaintiff believes Dixon had a role in her termination. Id.

(11)

Upon termination, Plaintiff was replaced by Kimberly McAliley, who is Caucasian. Id. at 118.

AO 72A
(Rev. 8/82)

4

(12)

To bolster her claims about mistreatment by Dixon, Plaintiff brought witnesses who testified that they, too, felt mistreated by Dixon. Janis Barrett was an Education Specialist and Service Coordinator with Defendant. Id. at 34. Barrett was complimentary of Plaintiff and critical of Dixon. Barrett felt that Dixon was harsh to her and the other Babies Can't Wait employees and "talked down" to them. Id. at 37-38. She also perceived Dixon as undervaluing the program. Id. at 42. Barrett is Caucasian. Id. at 47.

(13)

Likewise, Ms. Rosemary Hicks,[3] was an office manager who supported the Babies Can't Wait program. Dkt. No. 87 at 246.

(14)

Hicks perceived Dixon to be stress-inducing to the point that Hicks quit. Hicks believed Dixon belittled everyone. Id. at 250. However, Hicks believes she was treated worst of all. Id. at 255. Hicks is Caucasian. Id. at 256.

---

[3] Ms. Hicks was served with a subpoena by Plaintiff; however, Hicks sought to quash it based on a documented health issue that would make it difficult for Hicks to travel to Brunswick for the trial. Because Plaintiff desired Hicks' trial testimony, the Court held that part of the trial in Savannah to alleviate Hicks' health concerns while honoring Plaintiff's desire to have Hicks testify. Dkt. No. 87 at 244 (for the sake of continuity, citations to page numbers in dkt. no. 87 will be to the page numbers on the actual transcript).

(15)

Plaintiff called Sylvester Nixon as a witness, but he did not know of any instances of misconduct by Dixon or others. Dkt. No. 86 at 53.

(16)

Plaintiff called Vanessa Powers as a witness. Powers is a Referral Specialist. Id. at 54. Powers did not like the idea that someone might be watching the employees in the office, but she did not have any specific problems with Dixon on the job. Id. at 57-58.

(17)

Plaintiff called Sondra Bailey as a witness. Bailey was a Program Specialist who felt that Dixon intimidated her because of Bailey's weight. Id. at 60-61. Bailey believes that Plaintiff is a "very professional person" while Dixon is "intimidating." Id. at 64.

**B. Defendant's Witnesses**

(18)

Dr. Saroyi Morris, an African-American female, supervised Plaintiff prior to Dixon. Dkt. No. 87 at 278. Morris has been a Program Manager at Coastal Health District since 2009. Id. at 277. She reports to Dr. Weems. Id.

AO 72A (Rev. 8/82)

(19)

Morris testified that, contrary to Plaintiff's beliefs about herself, Morris found supervising Plaintiff to be challenging. Id. at 279-81.

(20)

Morris testified that Plaintiff had problems with accountability and following policies regarding travel and reimbursement. Id. at 280-81. Morris had further complaints about Plaintiff allowing stimulus funding to expire due to credentialing issues. Id. at 281.

(21)

Contrary to Plaintiff's belief, Morris testified that she had to issue Plaintiff a letter of concern for not following travel policies and gave her a lower score on certain categories in her 2011 performance review. Id. at 279-83.

(22)

Even after Plaintiff began to be supervised by Dixon, Plaintiff continued to frustrate Morris. Morris was frustrated by Plaintiff's response to a decision not to increase Plaintiff's staff. Id. at 289. Morris testified that too much time was spent having to manage Plaintiff. Plaintiff forced "redundant effort to continually go over an issue that we had all agreed to move forward on." Id. at 301. Morris was contacted by another employee—Ms. Hendry—concerning Plaintiff's

whereabouts and had issues with e-mail encryption by Plaintiff. Id. Morris felt Plaintiff's behavior was not improving. Morris and Weems met to decide what to do about Plaintiff. Morris felt "we had given her the tools to succeed in the position, and I just didn't know that there was anything else we could do." Id. at 290. Morris agreed with Weem's decision to terminate Plaintiff. Id. at 291.

(23)

Dr. Diane Weems testified that as the Director of the Coastal Health District, she decided to terminate Plaintiff. She was aware that both Morris and Dixon had encountered problems in supervising Plaintiff. Dkt. No. 86 at 147-49. Weems gave examples of the specific problems and summarized them by saying Plaintiff had difficulty accepting decisions and moving on. Id. at 151.

(24)

According to Weems, the final straw was added in 2015 with regard to staffing of the Babies Can't Wait program. Weems testified that Plaintiff refused to accept the decision made by management that Plaintiff's staff would not be increased in the manner requested by Plaintiff. Multiple people were forced to take time in responding to Plaintiff about a decision that had been made. Id. at 153-59.

(25)

Weems discussed Plaintiff's behavior with Morris. Weems decided that Plaintiff exhibited a pattern of behavior that coaching and mentoring could not cure. Id. at 168. Morris agreed. Dkt. No. 87 at 301. According to Weems, Dixon was not involved in the decision to terminate Plaintiff and learned of it after Plaintiff was terminated. Dkt. No. 86 at 166.

(26)

Weems decided not to terminate her "for cause" but decided to inform her that she was no longer a good fit. Id. at 130-31; 168.

(27)

Elizabeth Dixon testified. She is Director of Nursing and Clinical Services and reports to Morris. Id. at 196, 198.

(28)

Dixon supervised Plaintiff. Although Dixon had multiple duties and supervised numerous people, she testified that she spent from 30 to 50 percent of her time managing Plaintiff. Id. at 203.

(29)

Dixon testified, "[Plaintiff] chafed under supervision. She, in my opinion, rebelled against supervision." Id. at 204.

(30)

Dixon echoed the challenges and problems involving supervising Plaintiff outlined by Weems and Morris, including travel, accountability, following policies and procedures, e-mail encryption and others. Id. at 203-215.

(31)

Dixon testified that she played no role in Lockwood's termination and was "stunned" to learn of it when Weems told her. Id. at 223.

(32)

Dixon testified that she never changed Plaintiff's travel expense requests. Id. at 224. As for the "you are being watched" comment, she explained that the staff had moved into a new building, and that it was important for everyone to come to work and leave at an appropriate time. She explained that several people, not just Plaintiff, were asked to remove their blinds. As for asking Plaintiff to remove boxes from the top shelf, Dixon testified that the boxes were too close to the sprinklers. Id. at 225-30.

(33)

Dixon testified that she had concerns about Plaintiff's knowledge of the Babies Can't Wait program. She observed Plaintiff using outdated materials. Id. at 214-15.

(34)

Ms. Nicole Smith testified that she is a Human Resource Manager. Id. at 172. She understood that Plaintiff had issues following procedures. Id. at 177. She testified about an encounter she had with Plaintiff regarding Plaintiff's request for contractor badges. When Smith informed Plaintiff that the request was denied, Smith perceived Plaintiff to respond by being "difficult and bullying." Id. at 183-84.

(35)

Ms. Evangeline McCarty testified that she is an Accounting Manager at Coastal Health District. Dkt. No. 87 at 266. She testified that on one occasion, she, as account manager responsible for reviewing the accuracy of reimbursement requests, reduced by half the rental car taxes requested by Plaintiff for a trip in 2014. Id. at 274. The reduction was because the rental car was utilized by Plaintiff in part for work business and in part for personal use. Id. at 275. The Defendant did not reimburse Plaintiff for the personal portion of the rental car bill. Id. at 274-75.

II. **Conclusions of Law**

(1)

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discharge or otherwise change the terms and conditions of a person's employment based on race (along with

other protected classes). 42 U.S.C. § 2000e-2(a)(1); Lewis v. City of Union City, No. 15-11362, 2019 WL 1285058, at *3 (11th Cir. Mar. 21, 2019) (en banc).

(2)

A plaintiff may establish such disparate treatment on the basis of race through either direct or circumstantial evidence. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004).

(3)

Statements that suggest a discriminatory motive but do not in and of themselves prove one are circumstantial evidence, while blatant statements whose intent means nothing other than racial discrimination are direct evidence.

(4)

A plaintiff relying on circumstantial evidence may utilize the burden-shifting framework set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973).[4]

(5)

Pursuant to McDonnell Douglas, a plaintiff establishes a *prima facie* case of discrimination when it is shown that (1) the plaintiff belongs to a protected class, (2) the plaintiff was qualified for the job, (3) the plaintiff suffered an adverse

---

[4] A plaintiff may also demonstrate a "convincing mosaic" of circumstantial evidence that warrants an inference of intentional discrimination. Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011) (citation omitted).

12

employment action, and (4) the plaintiff was replaced by a person outside the protected class or was treated less favorably than someone outside her protected class. See id. at 802.

(6)

The plaintiff bears the initial burden of establishing, by a preponderance of the evidence, a *prima facie* case of discrimination. If a *prima facie* case is established, the burden shifts to the defendant to set forth a legitimate, nondiscriminatory reason for its actions. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). If the defendant carries its burden, the plaintiff must then show that the proffered reason was merely a pretext for unlawful discrimination. Id. at 256.

(7)

A defendant's burden of articulating a legitimate, non-discriminatory reason for its actions is "exceedingly light," meaning the defendant must proffer the legitimate reasons. Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997) (citation omitted).

(8)

If defendant adequately articulates a legitimate, non-discriminatory reason for its actions, a plaintiff's ultimate burden of proving intentional discrimination merges with the

plaintiff's burden of establishing the defendant's reasons were pretextual. Burdine, 450 U.S. at 255.

(9)

In order to show pretext, a plaintiff must prove that a defendant's stated reason is not the true reason, but rather the true reason amounts to unlawful discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508 (1993).

(10)

An isolated "stray" remark, unrelated to an adverse employment decision, is insufficient to establish pretext. Rojas v. Fla., 285 F.3d 1339, 1342-43 (11th Cir. 2002).

### III. Mixed Questions of Fact and Law

(1)

Based on the credible testimony and facts proven at trial, Plaintiff has not carried her burden of proving that her termination was racially discriminatory.[5]

(2)

While it was clear at trial that Plaintiff and some of her witnesses believe that her termination was wrongful, there was insufficient evidence that the treatment of Plaintiff was motivated by race or done with a racially discriminatory intent.

---

[5] Likewise, it was not proven that any other adverse employment circumstance, such as the reduction in the rental car reimbursement, was racially motivated or discriminatory.

14

AO 72A
(Rev. 8/82)

(3)

There was no direct evidence of discrimination, nor was there a convincing mosaic of circumstantial evidence that warrants an inference of intentional discrimination. The two isolated remarks involving a racial topic are properly characterized as stray remarks.

(4)

Plaintiff properly turned to the McDonnell Douglas burden-shifting framework, and she did establish a *prima facie* case of discrimination.

(5)

Defendant met its burden of rebutting the *prima facie* presumption by articulating a legitimate, non-discriminatory reason for its actions. In that regard, the Court found credible the testimony of multiple supervisors who believed they spent too much time managing Plaintiff and found her to have problems with accountability and accepting decisions with which she did not agree.

(6)

Ultimately, Plaintiff was not able to prove that Defendant's reasons were pretext for unlawful discrimination and that the real reason was racial discrimination. Instead, Plaintiff's proof concentrated on the management style of her prior supervisor. However, Plaintiff's own witnesses eventually

bolstered Defendant's position that such behavior was not linked to racial intent.

(7)

To be clear, the Court's conclusion does not mean that Plaintiff was a bad employee nor that she should or should not have been fired. It is apparent that Plaintiff is passionate about the Babies Can't Wait program and had the admiration of some of her colleagues. The Court does conclude, however, that Plaintiff did not prove that she was subjected to racial discrimination in her employment and termination.

(8)

Defendant is entitled to judgment in its favor.

**SO ORDERED**, this 27th day of March, 2019.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA